David M. Barkan (CA 160825 / barkan@fr.com)
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 400
Redwood City, CA  94063
Tel: (650) 839-5070 / Fax: (650) 839-5071

Robert Courtney (CA 248392 / courtney@fr.com)
FISH & RICHARDSON P.C.
60 South Sixth St., Suite 3200
Minneapolis, MN 55402
Tel: (612) 335-5070

A. Louis Dorny (CA 212054 / ldorny@tesla.com)
TESLA, INC.
3000 Hanover St.
Palo Alto, CA 94304
Tel: (510) 298-8516

Paul Margulies (*pro hac vice* / pmargulies@tesla.com)
TESLA, INC.
800 Connecticut Ave. NW
Washington, DC 20006
Tel: (202) 695-5388

Attorneys for Plaintiff, TESLA, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| TESLA, INC.,<br><br>       Plaintiff,<br><br>    v.<br><br>MATTHEWS INTERNATIONAL CORPORATION, a Pennsylvania corporation,<br><br>       Defendant. | Case No. 5:24-cv-03615-EJD<br><br>**TESLA, INC.'S OPPOSITION TO MATTHEWS' MOTION TO COMPEL ARBITRATION**<br><br>Date:    October 3, 2024<br>Time:    9:00 a.m.<br>Place:   Courtroom 4, 5th Floor<br>Judge:  Hon. Edward J. Davila |

**▬REDACTED DOCUMENT SOUGHT TO BE SEALED**

## TABLE OF CONTENTS

I.      COUNTER-STATEMENT OF THE ISSUES TO BE DECIDED ................................... 1

II.     COUNTER-STATEMENT OF FACTS ........................................................................ 1

    A.      Tesla and Its Proprietary Dry Battery Electrode ("DBE") Process........................ 1

    B.      Matthews: Manufacturer of Custom Equipment Designed With and
        For Tesla ................................................................................................................ 1

    C.      Matthews' Gross Mishandling of Tesla's Valuable Confidential
        Information ............................................................................................................ 4

III.    LEGAL STANDARD ................................................................................................ 5

IV.     ARGUMENT............................................................................................................ 6

    A.      The Court Should Deny Matthews' Motion Because the Parties
        Unambiguously Agreed That Disputes Regarding Treatment of
        Confidential Information Must Be Litigated in the Courts of Santa
        Clara County, California....................................................................................... 6

        1.      Where, As Here, There Are Multiple Agreements Between
            the Parties, the Court Must Determine Which Agreement
            Controls For Purposes of the Plaintiff's Claims Before
            Contemplating Compulsory Arbitration ................................................... 7

        2.      The Record Overwhelmingly Demonstrates That the NDAs
            "Control" for Purposes of Determining Whether a Duty to
            Arbitrate Exists ......................................................................................... 8

        ████   ████████████████████████████
            ██████████████████████████
            ███████████████████
            ███████████ ......................................................................... 9
        ████   ████████████████████████████
            ██████████████████████████

1 ████████████████████████

2 ██████████████████ .................................. 13

3    █ ████████████████████████

4 ██████████████ ......................................... 14

5         d.        Matthews' Cited Authority Is Not Contrary ................................ 15

6      3.      Because the NDAs Control and Require This Court or Others

7             in Santa Clara County to Resolve Disputes Thereunder, the

8             Court Should Deny Matthews' Motion to Compel

9             Arbitration ........................................................................... 16

10 █ ████████████████████████

11    ████████████████ ......................................... 16

12 V.    CONCLUSION ........................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) ............................................................................... 15

*Coinbase, Inc. v. Suski*,
    144 S. Ct. 1186 (2024) ...........................................................................5, 7, 8, 15

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) ............................................................................................. 16

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
    97 F.4th 1190 (9th Cir. 2024) .............................................................................. 15

*Frangipani v. Boecker*,
    75 Cal. Rptr. 2d 407 (Cal. Ct. App. 1998) ........................................................... 13

*Goldman, Sachs & Co. v. City of Reno*,
    747 F.3d 733 (9th Cir. 2014) .............................................................................5, 8, 13

*Hansen v. LMB Mortg. Servs., Inc.*,
    1 F.4th 667 (9th Cir. 2021) ..................................................................................... 5

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019) ..............................................................................................16, 17

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,
    957 F.3d 1038 (9th Cir. 2020) (applying California contract law) ......................... 8

*Johnson v. Walmart Inc.*,
    57 F.4th 677 (9th Cir. 2023) ...............................................................................8, 11

*Knutson v. Sirius XM Radio Inc.*,
    771 F.3d 559 (9th Cir. 2014) ...............................................................................5, 15

*McEnery v. McEnery*,
    621 F. Supp. 3d 1059 (N.D. Cal. 2022) (Gilliam, USDJ) ..................................... 15

*Meggitt San Juan Capistrano, Inc. v. Yongzhong*,
    575 F. App'x 801 (9th Cir. 2014) ........................................................................... 5

*Patrick v. Running Warehouse, LLC*,
    93 F.4th 468 (9th Cir. 2024) ................................................................................. 15

*San Diego Constr. Co. v. Mannix*,
    166 P. 325 (Cal. 1917) .......................................................................................... 13

*Suski v. Coinbase, Inc.*,
    55 F.4th 1227 (9th Cir. 2022), *aff'd*, 144 S. Ct. 1186 (2024) ............................................7, 13

*Tabas v. MoviePass, Inc.*,
    401 F. Supp. 3d 928 (N.D. Cal. 2019) ...................................................................................... 5

**Statutes**

Cal. Civ. Code § 1636 .......................................................................................................... 8

Cal. Civ. Code § 1641 .......................................................................................................... 8

**Other Authorities**

*Summary of California Law* § 770 (11th ed. 2024)...................................................... 13

**TABLE OF EXHIBITS**

| Citation | Description |
|---|---|
| Dkt. 17-6, Ex. 1 | ████████████ ██████████████████ |
| Dkt. 17-5 | CONFIDENTIAL Declaration of Gregory Babe, Matthews' CTO |
| Eggleston Decl. | CONFIDENTIAL Declaration of Dr. Bonne Eggleston; Tesla's Senior Director of 4680 (filed herewith) |
| Exhibit 1[1] | CONFIDENTIAL Email fr. Greg Babe, Matthews, to Roshan Shankar, Tesla (Feb. 12, 2021, attachment omitted) |
| Dkt. 17-5, Ex. 6 | CONFIDENTIAL Letter fr. Bonne Eggleston, Tesla, to Joseph Bartolacci & Greg Babe, Matthews (Nov. 10, 2023) |
| Exhibit 2 | ████████████ ██████████████████ |
| Dkt. 6-3 | CONFIDENTIAL Tesla-Matthews NDA (effective April 1, 2019) |
| Dkt. 6-4 | CONFIDENTIAL Tesla-Matthews NDA (effective July 1, 2019) (*see also* Dkt. 17-5, Ex. 3) |
| Dkt. 6-5 | CONFIDENTIAL Tesla-Matthews NDA (effective March 14, 2022) (*see also* Dkt. 17-5, Ex. 5) |
| Dkt. 17-5, Ex. 2 | ████████████ ████████████████████████ ████████ |
| Dkt. 17-5, Ex. 4 | ████████████ ████████████████████████ |
| Dkt. 17-5, Ex. 1 | ████████████ ████████████████████████ |

**TABLE OF ABBREVIATIONS**

| Abbreviation | Meaning |
|---|---|
| DBE | Dry Battery Electrode, i.e., manufacture of electrodes for lithium-ion batteries with greatly reduced use of solvents and slurries |
| ████ | ████████████████████████████ |
| NDAs | Tesla-Matthews NDAs (i.e., Dkts. 6-3, 6-4, 6-5, 17-5 Ex. 2) |

---

[1] Exhibits 1 and 2 are attached to the Declaration of Robert Courtney, filed herewith.

## I.    COUNTER-STATEMENT OF THE ISSUES TO BE DECIDED

1.    Do the Tesla-Matthews NDAs (executed in 2019 and 2022), which lay out the parties' confidentiality obligations and which identify this Court as a forum for resolving disputes related thereto, control review of Matthews' request for arbitration?

2.    If so, does the record surrounding the NDAs, including the absence of any arbitration clause therein and the presence of a clear forum selection clause, warrant a determination that the parties did not agree to arbitrate disputes relating to treatment of Tesla's confidential information?

## II.    COUNTER-STATEMENT OF FACTS

### A.  Tesla and Its Proprietary Dry Battery Electrode ("DBE") Process

Tesla is the world's innovation and manufacturing leader for sustainable energy production, storage, and automotive technologies.  Dkt. 1 ¶ 11.  This case relates to a crucial aspect of Tesla's business: its industry-leading battery technology.   Specifically, this case concerns Tesla's proprietary "dry-electrode" (sometimes called "DBE," or "dry battery electrode") process for manufacturing the electrodes used in lithium-ion battery cells.   *Id.* ¶ 12.  This path-breaking innovation is already reducing cost, energy consumption, and production cycle time for Tesla's manufacturing lines.  *Id.*  This includes at Tesla's Austin factory, which recently manufactured its *fifty millionth* lithium-ion cell using Tesla's DBE process.  *Id.*

### B.  Matthews: Manufacturer of Custom Equipment Designed with and For Tesla

Like any large manufacturer, Tesla relies on trusted suppliers to supply "pilot" (i.e., pre-mass-production) and assembly line machinery suiting Tesla's requirements, which Tesla deploys as needed.  *Id.* ¶ 13.  In 2019, Tesla selected Matthews to be one of its suppliers for equipment that Tesla used to refine its dry-electrode battery manufacturing and to put it into mass-production.  *Id.*

Contrary to the Motion's allegations, Matthews is not a DBE "pioneer."  *See* Eggleston Decl. ¶¶ 3–13.  The attached declaration from Tesla's Senior Director of 4680 Dr. Bonne Eggleston explains why.[2]  *Id.*  In brief, Matthews' history as a high-technology company is recent.  Its largest and oldest business segment makes and sells caskets, gravesite memorials, and cremation

---

[2] "4680" is the battery cell Tesla makes using DBE technology.  Eggleston Decl. ¶ 1.

equipment.  *Id.* ¶ 5.  Matthews' "Industrial Technologies" business segment has historically been its smallest by revenue.  *Id.*  The majority of Matthews' activities relevant to this dispute are through its German subsidiary Saueressig, which Matthews acquired in 2011.  Dkt. 17-5 ¶ 9.

The primary DBE experience that Saueressig (and by extension Matthews) has is in providing custom equipment for Tesla's DBE process.  Eggleston Decl. ¶ 8.  ███████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████  Nothing about Tesla's relationship with Matthews transformed it from a maker of custom machinery for others into an independent "pioneer," as the Motion claims.

Before its relationship with Tesla, Matthews' only substantive "dry-electrode" experience was providing custom equipment to a company called Maxwell Technologies, Inc. for a different energy storage device, ultracapacitors.  *Id.* ¶ 5.  ***Maxwell***—not Matthews—performed groundbreaking DBE research, and in 2019 Maxwell became part of Tesla.  *Id.* ¶ 4.  As part of that acquisition, ███████████████████████████████████████████████.  *Id.* ¶ 8.  While Tesla saw value in Matthews' abilities regarding the manufacture of custom machinery, it decidedly did ***not*** view Matthews as any sort of DBE pioneer.  *Id.* ¶ 6.  As Dr. Eggleston's declaration explains, "Matthews' expertise is in receiving designs and ideas from others and providing custom machinery to suit." *Id.*

The Motion's contrary allegations are unsupported, inaccurate, or both.  The Motion claims for Matthews the mantle of DBE "pioneer" (Mot. 4) but nothing in the record—and, notably, nothing in the Declaration of Matthews' CTO Mr. Babe—supports that claim.[3]  While Mr. Babe claims a "decade of experience" in DBE (Dkt. 17-5 ¶ 11), even he does not go so far as to call Matthews a "pioneer" in that space.  Nor could he, ███████████████████████████████, Matthews has ***never independently developed DBE technology.***  Eggleston Decl. ¶¶ 6–7.  There is also no support in the record (and none in Mr. Babe's declaration) for the Motion's statement that Matthews

---

[3] The unsworn statements in ███████████████████████████████ are not contrary for the reasons in Dr. Eggleston's declaration.

has made "production lines" for dry electrodes for nickel batteries or ultracapacitors in the past. *Compare* Mot. 5, *with* Eggleston Decl. ¶13.  Nor is there any support for the Motion's claim that Matthews designed calenders (e.g., industrial roller machines) for other unnamed customers' "dry battery process lines."  *Compare* Mot. 5, *with* Eggleston Decl. ¶13.

Because Tesla's DBE technology was highly proprietary and unprecedented in the industry, it was important to Tesla that Matthews hold information related to this technology in the strictest confidence.  Dkt. 1 ¶ 14.  To that end, Tesla and Matthews entered into two non-disclosure agreements ("NDAs") on April 1, 2019 and July 1, 2019, to govern information sharing between the parties as they discussed a potential business relationship.[4]  *See* Dkts. 6-3, 6-4; *see also* Eggleston Decl. ¶ 9.  The NDAs establish a detailed and robust confidentiality regime.  They oblige Matthews to protect Tesla's confidential and proprietary information and not disclose that information to those not authorized to receive it, or to use it in any manner not authorized by Tesla. *E.g.*, Dkt. 6-3 ¶ 2.  Each NDA includes a forum selection clause confirming that California courts have exclusive jurisdiction over any disputes thereunder.  *Id.* ¶ 12 ("The exclusive venue for any judicial action arising out of or relating to this NDA will be the state, federal, or regional courts for [Santa Clara County, California].  The parties . . . hereby waive any challenge to venue and jurisdiction in such courts.").





### C. Matthews' Gross Mishandling of Tesla's Valuable Confidential Information

As the Original Complaint explains, Tesla trusted Matthews with highly confidential information regarding its proprietary DBE process. Dkt. 1 ¶¶ 14, 70. Matthews betrayed that trust. It misappropriated Tesla's valuable confidential technology and undertook numerous improper acts. *Id.* ¶ 15. The Complaint describes two basic categories of misconduct.

The first category comprises Matthews' improper, unjustified, and unlawful filing of patent applications based, without authorization, on Tesla's valuable and confidential technology. *Id.* In so doing, Matthews attempted to claim for itself ownership of Tesla's confidential and valuable technology. *Id.* More, Matthews' misconduct has in some cases led to the publication of confidential and valuable Tesla technology. *Id.* The second category comprises Matthews' improper disclosure and use of Tesla's valuable and confidential technology to and for other companies, including Tesla's competitors. *Id.* ¶ 16. Without notice or authorization, Matthews

1    attempted to sell and in some cases sold DBE manufacturing equipment embodying Tesla's

2    confidential trade secrets to Tesla's competitors.[6]  *Id.*

3         To recover the enormous damage wrought by Matthews' misconduct, and to pursue the other

4    relief identified in the Original Complaint, Tesla brought this case.

5    **III.**     **LEGAL STANDARD**

6         District courts in the Ninth Circuit review a motion to compel arbitration under "a standard

7    similar to the summary judgment standard of [Federal Rule of Civil Procedure] 56." *Tabas v.*

8    *MoviePass, Inc.*, 401 F. Supp. 3d 928, 936 (N.D. Cal. 2019) (Ryu, USMJ) (alteration in original);

9    *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021).  Matthews, "as the party

10    seeking to compel arbitration, has the burden of proving the existence of an agreement to arbitrate

11    by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir.

12    2014).  The presumption of arbitrability "does not apply to disputes concerning whether an

13    agreement to arbitrate has been made." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743

14    (9th Cir. 2014).  Where, as here, the parties executed two contracts, one calling for arbitration and

15    one not, the district court must determine "which contract controls" for purposes of determining the

16    forum for the claims being presented.  *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1190 (2024).

17

18

19

20

21

22    [6] Matthews' contention that the Original Complaint "fails to identify one Tesla 'confidential trade

23    secret' that was included in a patent filing or that Tesla otherwise disclosed to Matthews" (Mot. 10)

24    is both inaccurate and off point.  The Original Complaint plausibly alleges every element of each

25    claim presented therein.  There is no requirement that a complaint describe all (or any) trade secrets

26    or other valuable confidential information underlying the claims.  *Meggitt San Juan Capistrano,*

27    *Inc. v. Yongzhong*, 575 F. App'x 801, 803 (9th Cir. 2014) (rejecting contention that a plaintiff must

28    "identif[y] the particular trade secrets *at the pleading stage*").

TESLA'S OPPOSITION TO MOTION
TO COMPEL ARBITRATION
Case No. 5:24-cv-03615-EJD

1

## IV.     ARGUMENT

**A.  The Court Should Deny Matthews' Motion Because the Parties Unambiguously Agreed That Disputes Regarding Treatment of Confidential Information Must Be Litigated in the Courts of Santa Clara County, California**

As discussed above, the Original Complaint presents tort and contract claims relating to Matthews' flagrant misuse of Tesla-confidential information.  Each claim rests on the contracts that establish Matthews' obligations for handling Tesla-confidential information, i.e., the three NDAs the parties executed between 2019 and 2022.  Every one of those contracts unambiguously confirms that disputes arising from Matthews' misuse of Tesla-confidential information (e.g., the claims in Tesla's Original Complaint) shall be addressed by the "state, federal, or regional courts" of Santa Clara County, California.  *E.g.*, Dkt. 6-3 ¶ 12.  The NDAs have ██████████████

██████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ █████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  The record could not be clearer that for confidentiality disputes, Tesla has no duty to arbitrate.

As this brief explains, Matthews' understanding of how the NDAs and ██████████ interact is seriously flawed.  The contract language, on the other hand, is clear.  The NDAs unambiguously identify this Court as an appropriate forum for disputes concerning the handling of Tesla's valuable confidential information.  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

TESLA'S OPPOSITION TO MOTION
TO COMPEL ARBITRATION
Case No. 5:24-cv-03615-EJD

1    ███████████    The Court should reject Matthews' contention that Tesla has a duty

2  to arbitrate claims relating to Matthews' confidentiality breaches.

3           **1.    Where, As Here, There Are Multiple Agreements Between the Parties,**

4                 **the Court Must Determine Which Agreement Controls for Purposes of**

5                 **the Plaintiff's Claims Before Contemplating Compulsory Arbitration**

6           Matthews' Motion commits a serious error when urging that analysis of the NDAs is a job

7  for an arbitrator and not the Court.  *E.g.*, Mot. 14.  That statement is wholly incompatible with the

8  Supreme Court's recent decision in *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024), which holds this

9  issue is for the Court to decide.  Remarkably, Matthews' Motion neither analyzes nor cites that

10  decision, though it is precisely on point here.  The Motion also fails to cite the Ninth Circuit's 2022

11  opinion in the same case, which the Supreme Court affirmed.  *Suski v. Coinbase, Inc.*, 55 F.4th 1227

12  (9th Cir. 2022), *aff'd*, 144 S. Ct. 1186 (2024).

13           *Coinbase* presents highly similar facts and compels denial of Matthews' motion.  Like this

14  case, *Coinbase* involved multiple agreements between the parties: a user agreement that had a

15  "delegation provision" requiring arbitration of disputes, and a set of sweepstakes rules with a "forum

16  selection clause" directing disputes to courts in California.  144 S. Ct. at 1191.  Upon being sued on

17  sweepstakes-related claims, Coinbase moved to compel arbitration based on the user agreement.  *Id.*

18  at 1192.  Like Matthews, Coinbase urged that plaintiffs' arguments opposing arbitrability should be

19  weighed by an arbitrator, and not by the district court.  *Id.*  The district court, the Ninth Circuit, and

20  the Supreme Court all rejected Coinbase's argument.  *Id.*  The Supreme Court's unanimous opinion

21  explains (contrary to Matthews' proposal) that in such a situation it is the court's duty to determine

22  *in the first instance* which contract "controls" for purposes of assessing whether an agreement to

23  arbitrate the pleaded claims exists:

24                 Arbitration is a matter of contract and consent, and we have long
                    held that disputes are subject to arbitration if, and only if, the parties

25                 actually agreed to arbitrate those disputes.  Here, then, before either
                    the delegation provision or the forum selection clause can be

26                 enforced, ***a court needs to decide what the parties have agreed to—***
                    ***i.e., which contract controls***.

27

28  *Id.* at 1191 (emphasis added).

TESLA'S OPPOSITION TO MOTION
                                                                                   TO COMPEL ARBITRATION
                                                                                   Case No. 5:24-cv-03615-EJD

*Coinbase*'s analysis is critical to resolving Matthews' Motion. *Coinbase* confirms that the first step is for the Court to determine which of the parties' agreements—the NDAs or ███—"controls" the forum determination for the Original Complaint's claims. *Id.* at 1193 ("When we home in on the conflict between the [two contracts] . . . the question is whether the parties agreed to send the given dispute to arbitration—and, per usual, *that* question must be answered by a court."). Tesla is entitled to judicial resolution of that necessary first step, and Matthews (which failed to consider or mention *Coinbase*) is wrong when it suggests that Tesla may be forced into arbitration on that point. Matthews' Motion skips this first step altogether, instead jumping right into the question of whether ██████████████████████████████. Mot. 13. But the Court need only reach that subsidiary question if it concludes ██████ rather than the NDAs, "control" forum selection. As discussed below, they do not.

### 2.     The Record Overwhelmingly Demonstrates That the NDAs "Control" for Purposes of Determining Whether a Duty to Arbitrate Exists

The Supreme Court has confirmed that if there are multiple agreements between parties, then before a court determines whether an agreement to arbitrate exists, it must first determine which agreement "controls" for purposes of that case. *Coinbase*, 144 S. Ct. at 1193. This framing makes sense because if the NDAs "control"—which they do—then their forum selection clause must be enforced. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742–43 (9th Cir. 2014). Because such an inquiry relates to the existence of an arbitration agreement (and not the scope thereof), there is no presumption of arbitrability. *Id.* Where, as here, the existence of an arbitration agreement is at issue, the court "use[s] general state-law principles of contract interpretation to decide whether a contractual obligation to arbitrate exists." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). Here, California law applies. *See* Dkt. 6-3 ¶ 12. In California, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. The contract must be interpreted as a whole. Cal. Civ. Code § 1641; *see also Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042–44 (9th Cir. 2020) (applying California contract law).

1    Here, the record overwhelmingly indicates that the NDAs—not ████████ must control

2    any inquiry into whether the parties agreed to arbitrate the trade secret, unfair competition, and

3    breach-of-NDA claims in the Original Complaint.  This is for two overlapping reasons.  First, the

4    basic  structure  of  the  NDAs  and  of  ████████  confirms  the  parties'  express  bargain  that

5    confidentiality  disputes  would  be  judicially  resolved  by  this  Court  or  by  others  in  Santa  Clara

6    County.



TESLA'S OPPOSITION TO MOTION
TO COMPEL ARBITRATION
Case No. 5:24-cv-03615-EJD



As discussed above, Tesla and Matthews entered the first two NDAs in early and mid-2019; the third was signed March 14, 2022.  *See* Dkts. 6-3, 6-4, 6-5.

1

2

3

4

5

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the

7 types of damages that are typically associated with trade secret misappropriation and breach of

8 confidentiality obligations.  The logical conclusion from this approach is ***not*** the parties agreed that

9 Matthews could steal, use, and publish Tesla's confidential technical information with impunity,

10 and that would be nonsensical for Tesla to have conceded.  Rather, the logical conclusion is that

11 those claims are governed by the contracts that set forth the confidentiality obligations and trade

12 secret duties themselves: the NDAs.

13       In such circumstances, it is beyond serious question that the dispute presented by Tesla's

14 Original Complaint arises from the NDAs, and not ▮▮▮▮▮▮▮.  Recent authority from the Ninth

15 Circuit confirms it.

16       In *Johnson v. Walmart Inc.*, a customer entered into multiple agreements with Walmart: a

17 "Terms of Use" agreement accompanying a tire purchase that included an arbitration provision, and

18 a tire-service agreement.  57 F.4th 677, 679–80 (9th Cir. 2023).  Under California law, the Ninth

19 Circuit found no agreement to arbitrate disputes over the tire-service agreement.  *Id.* at 682.  The

20 court reasoned the arbitration clause in the "Terms of Use" did not apply to claims under the

21 "separate, independent" tire-service agreement, even though the two contracts "involve[d] the same

22 parties and the same tires."  *Id.* at 682–83.  The court laid out three considerations confirming its

23 holding, all of which are applicable here.

24       First, the service agreement was separately entered into and negotiated from the tire

25 purchase.  *Id.* at 683.  Just so here, where Matthews bound itself to the NDAs separately, and for

26 separate reasons, from ▮▮▮▮▮▮.  Second, in *Johnson* the two contracts involved separate

27 consideration.  *Id.*  Again, just so here, where the NDA consideration was access to Tesla's

28 information, while ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1 ██████. Third, in *Johnson* the customer's claim "depend[ed] exclusively on the terms of the Service

2 Agreement," and no part of that claim's proof concerned the tire purchase. *Id.* That is precisely the

3 case here. Nothing in Tesla's Original Complaint depends, in any way, on Matthews' conduct

4 ████████████ The Original Complaint solely rests on Matthews' breach of the NDAs. ███



1    For these reasons, the Court should determine that, by the basic terms of the NDAs and

2  ████████ and of Tesla's Original Complaint, the NDAs are the controlling contract for the purpose of

3  resolving Matthews' Motion.

4  ████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████

15 ██████████████████████████████████████████████

16 ████████████████████████████████, the record is unambiguous that in 2022 Tesla and

17 Matthews confirmed, in writing, that disputes regarding confidentiality should be directed to the

18 courts of Santa Clara County.  The Ninth Circuit has confirmed that such a writing may supersede

19 a prior arbitration agreement.  *Goldman, Sachs & Co.*, 747 F.3d at 741; *see also Suski*, 55 F.4th at

20 1231 (holding that "[b]y including the forum selection clause, . . . the [second agreement] evince[s]

21 the parties' intent not to be governed by the [prior agreement]'s arbitration clause when addressing

22 controversies concerning the sweepstakes"). ████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████████████

25 ██████████████████████

26    The Ninth Circuit has confirmed that in California, "[t]he general rule is that when parties

27 enter into a second contract dealing with the same subject matter as their first contract without stating

28 whether the second contract operates to discharge or substitute for the first contract, the two

contracts must be interpreted together and the latter contract prevails to the extent they are inconsistent."  *Suski*, 55 F.4th at 1230 (alteration in original) (quoting *Capili v. Finish Line, Inc.*, 116 F. Supp. 3d 1000, 1004 n.1 (N.D. Cal. 2015)).  California's state courts have so held for more than a century.  *E.g.*, *San Diego Constr. Co. v. Mannix*, 166 P. 325, 326 (Cal. 1917) ("[T]he later [contract] supersed[es] the earlier one wherever it is inconsistent therewith."); *Frangipani v. Boecker*, 75 Cal. Rptr. 2d 407, 409 (Cal. Ct. App. 1998) ("Where there is an inconsistency between two agreements both of which are executed by all of the parties, the later contract supersedes the former."); *see also* 1 *Witkin's Summary of California Law* § 770 (11th ed. 2024) (collecting authority).

That is the situation here. ████████████████████████

█████████████████████████████████████████████████████████

██████████████████ This is yet another reason why the Court should determine that the 2022 NDA is the "operative contract" for purposes of Matthews' Motion.

█████████████████████████████████████████████████

███████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████ Matthews' argument elevates form over function.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████


#### d.  Matthews' Cited Authority Is Not Contrary

As already noted, Matthews' Motion inexplicably fails to address *Coinbase*, notwithstanding its direct implications for the current dispute.  But even setting that omission aside, the authority Matthews does cite is not contrary.  Matthews' discussion of the NDAs (Mot. 14–15) principally relies on *McEnery v. McEnery*, 621 F. Supp. 3d 1059 (N.D. Cal. 2022) (Gilliam, USDJ), but while that case involved multiple agreements, both contained arbitration clauses.  621 F. Supp. 3d at 1063. *McEnery* was thus sharply distinct from the present case, in which the NDAs—the agreement addressing conduct directly on point for the claims being presented— ████████████████████ ██████████████████████████

Matthews' other citations generally relate to interpretation of arbitration clauses, and so are off point.  *E.g.*, *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190 (9th Cir. 2024) (discussing an arbitration clause's delegation of unconscionability challenges); *Patrick v. Running Warehouse, LLC*, 93 F.4th 468 (9th Cir. 2024) (discussing an arbitration clause's incorporation of rules); *Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015) (interpreting arbitration clause); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559 (9th Cir. 2014) (interpreting arbitration clause).  Such authority has no impact here for the simple reason that the NDAs ████████████████ instead select this Court as a forum for disputes regarding mishandling of confidential information.  ████ ██████████████████████████

1   ████████████████████████████████   Under *Coinbase*, that approach is wrong because (for the

2   reasons discussed) the NDAs, not ████████, are the controlling contract.

3       **3.**      **Because the NDAs Control and Require This Court or Others in Santa**

4           **Clara County to Resolve Disputes Thereunder, the Court Should Deny**

5           **Matthews' Motion to Compel Arbitration**

6        For the reasons discussed above, the NDAs are the operative contract for purposes of

7   determining whether a duty to arbitrate exists.  It is clear no such duty exists under the NDAs.  ████

8   ████████████████████████   The NDAs instead require any dispute "arising out of or

9   relating to this NDA" be brought in the courts of Santa Clara County, California.  Dkt. 6-5 ¶ 12.  In

10  other words, there exists no valid agreement to arbitrate Tesla's claims relating to the NDAs and

11  confidentiality obligations.  Courts can refer a dispute (including the question of arbitrability) to an

12  arbitrator only if a valid arbitration agreement exists.  *Henry Schein, Inc. v. Archer & White Sales,*

13  *Inc.*, 586 U.S. 63, 70 (2019) (citing 9 U.S.C. § 2); *see also First Options of Chicago, Inc. v. Kaplan*,

14  514 U.S. 938, 945 (1995) ("[A] party can be forced to arbitrate only those issues it specifically has

15  agreed to submit to arbitration.").  As there exists no valid agreement to arbitrate the present dispute,

16  the Court should deny Matthews' Motion.

17  ████████████████████████████████████████████████

18  ██████████████████████████████

19  ████████████████████████████████████████████████

20  ██████████████████████████████████████████████████

21  ██████████████████████████████████████████████████

22  ██████████████████████████████████████████████████

23  ██████████████████████████████████████████████████

24  ████████████████████ ████████████████████████████

25  ██████████████████████████████████████████████████

26  ██████████████████████████████████████████████████

27  ████████████████████████████

28

**V.      CONCLUSION**

For the reasons above, Tesla respectfully asks that the Court deny Matthews' motion and confirm that Tesla has no arbitration obligation for any claims in the Original Complaint.

Dated: July 9, 2024                                    FISH & RICHARDSON P.C.

                                                       By: */s/ Robert Courtney*
                                                           Robert Courtney

                                                       Attorney for Plaintiff,
                                                       TESLA, INC.