David M. Barkan (CA 160825 / barkan@fr.com)
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 400
Redwood City, CA 94063
Tel: (650) 839-5070 / Fax: (650) 839-5071

Robert Courtney (CA 248392 / courtney@fr.com)
FISH & RICHARDSON P.C.
60 South Sixth Street, Suite 3200
Minneapolis, MN 55402
Tel: (612) 335-5070

A. Louis Dorny (CA 212054 / ldorny@tesla.com)
TESLA, INC.
3000 Hanover Street
Palo Alto, CA 94304
Tel: (510) 298-8516

Paul Margulies (*pro hac vice* / pmargulies@tesla.com)
TESLA, INC.
800 Connecticut Ave. NW
Washington, DC 20006
Tel: (202) 695-5388

Attorneys for Plaintiff, TESLA, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| TESLA, INC., <br><br> Plaintiff, <br><br> v. <br><br> MATTHEWS INTERNATIONAL CORPORATION, a Pennsylvania corporation, <br><br> Defendant. | Case No. 5:24-cv-03615-EJD-VKD <br><br> **TESLA, INC.'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER** <br><br> Date:  To be scheduled <br> Time:  To be scheduled <br> Place:  Courtroom 4, 5th Floor <br> Judge:  Hon. Edward J. Davila |

■ **REDACTED DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

NOTICE OF MOTION ........................................................................................................... 1

STATEMENT OF REQUESTED RELIEF ............................................................................ 1

POINTS AND AUTHORITIES IN SUPPORT OF TESLA'S MOTION ............................... 2

I.      STATEMENT OF THE ISSUES TO BE DECIDED ................................................. 2

II.     STATEMENT OF RELEVANT FACTS ................................................................... 2

     A.      Matthews: Manufacturer of Custom Equipment Designed With and
         For Tesla ......................................................................................................... 2

     B.      Matthews's Betrayal ...................................................................................... 2

     C.      The Unique Harms Associated With Matthews's Threatened
         Disclosures ..................................................................................................... 6

     D.      Tesla and Its Proprietary Dry Battery Electrode ("DBE") Process ................... 7

     E.      Tesla's Trade Secrets in DBE and in Tesla's ▮▮▮▮ Tool ................................ 8

         1.      Tesla's Unique and Valuable ▮▮▮▮ Tool ............................................ 9

         2.      Tesla's specific and valuable trade secrets relating to the
            size, shape, positioning, and configuration of the ▮▮▮▮
            ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ................................................ 10

         3.      Tesla's trade secrets relating to the ▮▮▮▮▮▮▮
            ▮▮▮▮▮▮▮▮▮▮▮▮
            ▮▮▮▮▮ ................................................................................ 11

         4.      Tesla's trade secrets for handling the ▮▮▮▮▮ forces
            encountered in DBE manufacturing ......................................... 12

         5.      Tesla's ▮▮▮▮ Technology Is Highly Confidential ............................... 12

     F.      ▮▮▮▮▮▮▮▮▮▮▮ ........................................................................ 13

III.    ARGUMENT ........................................................................................................... 13

     A.      Legal Standards ............................................................................................. 13

B.     Tesla Is Likely to Succeed on The Merits of Its Claim that Matthews's Attempts to Sell or Disclose Tesla's DBE Technology in Europe and Into China Are Improper .................................................. 15

      1.     Tesla's Asserted ███████ Technology is Secret ..................................... 15

      2.     Tesla's Asserted ███████ Technology Is Independently Valuable .................................................................................... 16

      3.     Tesla Has Applied Reasonable Confidentiality Measures ...................... 17

      4.     Further Improper Disclosures by Matthews Are Imminent .................... 17

C.     Tesla Faces Irreparable Harm If Matthews Pursues Its Threatened Disclosures ..................................................................................... 18

D.     The Balance of Equities Favors Protecting Tesla by Requiring Matthews's Compliance With Its Obligation to Maintain Confidentiality of Tesla's DBE Trade Secrets ..................................... 19

E.     Protecting Tesla from Matthews's Attempts to Share Tesla's Valuable DBE Technology With Chinese Factories is Consistent With the Public Interest ....................................................................... 19

F.     Because an Injunction Is Both Substantively Warranted and Necessary to Preserve the Meaningfulness of the Arbitration Process, the Court Has Authority to Grant Tesla's Requested Relief ................. 20

IV.     THE NEED FOR CONFIDENTIAL DISCOVERY FROM MATTHEWS ................... 21

V.     CONCLUSION ............................................................................................ 22

1

## TABLE OF AUTHORITIES

2

**Page(s)**

**Cases**

3

*Art of Living Found. v. Does 1–10,*
4
   No. 10-cv-05022-LHK, 2011 WL 2441898 (N.D. Cal. June 15, 2011) ................................ 16

5

*Babaria v. Blinken,*
   87 F.4th 963 (9th Cir. 2023)....................................................................................... 13
6

*Bennett v. Isagenix Int'l LLC,*
7
   118 F.4th 1120 (9th Cir. 2024)........................................................................................ 14

8

*Capriole v. Uber Techs., Inc.,*
9
   7 F.4th 854 (9th Cir. 2021)...................................................................................13, 21

10

*Compass Bank v. Hartley,*
   430 F. Supp. 2d 973 (D. Ariz. 2006) .............................................................................. 19
11

*Corp. Techs., Inc. v. Harnett,*
12
   943 F. Supp. 2d 233 (D. Mass.), *aff'd*, 731 F.3d 6 (1st Cir. 2013) ...................................... 20

13

*Council on Am.-Islamic Relations v. Gaubatz,*
14
   667 F. Supp. 2d 67 (D.D.C. 2009)................................................................................. 20

15

*Disney Enters., Inc. v. VidAngel, Inc.,*
   869 F.3d 848 (9th Cir. 2017)........................................................................................ 14
16

*Empire Steam Laundry Co. v. Lozier,*
17
   130 P. 1180 (Cal. 1913) ............................................................................................... 14

18

*HCC Specialty Underwriters, Inc. v. Woodbury,*
19
   289 F. Supp. 3d 303 (D. N.H. 2018)............................................................................. 20

20

*Indep. Techs., LLC v. Otodata Wireless Network, Inc.,*
   836 Fed. App'x 531 (9th Cir. 2020) ................................................................................ 5
21

*Iofina, Inc. v. Khalev,*
22
   No. CIV-14-1328-M, 2017 WL 663558 (W.D. Okla. Feb. 17, 2017).................................. 20

23

*Koller v. Brown,*
   224 F. Supp. 3d 871 (N.D. Cal. 2016) ............................................................................ 13
24

*Onsite 340B, LLC v. 340Basics, Inc.,*
25
   No. 18-CV-596-JS, 2018 WL 2323790 (E.D. Pa. Feb. 14, 2018)....................................... 20

26

*Richmond Techs., Inc. v. Aumtech Bus. Sols.,*
27
   No. 11-cv-02460-LHK, 2011 WL 2607158 (N.D. Cal. Jul. 1, 2011)................................... 19

28

*Syntex Ophthalmics, Inc. v. Tsuetaki*,
    701 F.2d 677 (7th Cir. 1983)...................................................................................... 16

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
    316 F.2d 804 (9th Cir. 1963)...................................................................................... 14

*Toyo Tire Holdings of Americas, Inc. v. Continental Tire North Am., Inc.*,
    609 F.3d 975 (9th Cir. 2010)............................................................... 13, 14, 20, 21

*Underwater Storage, Inc. v. U.S. Rubber Co.*,
    371 F.2d 950 (D.C. Cir. 1966) .................................................................................. 16

*Whole Women's Health v. Jackson*,
    141 S. Ct. 2494 (2021).............................................................................................. 14

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................................... 14

**Statutes**

18 U.S.C. §§ 1836, 1839......................................................................................................... 14

Cal. Civ. Code § 3426.1.......................................................................................................... 14

Cal. Civ. Code § 3426.2.......................................................................................................... 14

**Other Authorities**

Fed. R. Civ. P. 65(a)............................................................................................................... 14

1

### NOTICE OF MOTION

2   PLEASE TAKE NOTICE that at such date and time as may be determined by Judge

3   Davila of the United States District Court for the Northern District of California, the Court will

4   hear this Motion for a Temporary Restraining Order in Courtroom 4, 5th Floor, 280 South 1st

5   Street, San Jose, California.

6

### STATEMENT OF REQUESTED RELIEF

7   Within hours of an expiring standstill agreement, Matthews announced today via press

8   release its intention to disclose to Tesla's competitors the valuable confidential technologies—*i.e.*,

9   Tesla's trade secrets—at issue in this proceeding.  Because such disclosures cannot be undone, and

10  because even the preliminary record (*i.e.*, without technical production from Matthews) confirms

11  that those disclosures would release Tesla's valuable trade secrets into the world with no hope of

12  restoring the *status quo*, Tesla respectfully requests a temporary restraining order as follows:

13  • Tesla asks that the Court temporarily enjoin Matthews from selling, attempting to sell,

14      disclosing, or attempting to disclose any article, document, equipment, or other matter

15      comprising Tesla's valuable trade secrets relating to dry battery electrode ("DBE")

16      manufacture and/or Tesla's ███████ DBE tool.  This specifically includes Matthews's

17      demonstration to third parties of equipment based on Tesla's ███████.

18  • Tesla asks that the Court order Matthews to immediately produce information

19      sufficient to completely demonstrate the design and operation of the DBE equipment

20      Matthews has demonstrated or plans to demonstrate to companies other than Tesla.

21  The proposed relief is necessary to protect Tesla from imminent and irreparable harm

22  while Tesla prepares a more fulsome preliminary injunction motion within fourteen days of the

23  Court's order.

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████.  Tesla faces irreparable and immediate harm.  As

27  discussed further herein, the Court has inherent authority to enter temporary relief in such

28  circumstances.

1         **POINTS AND AUTHORITIES IN SUPPORT OF TESLA'S MOTION**

2 **I.    STATEMENT OF THE ISSUES TO BE DECIDED**

3       1.    Whether the Court should enter a temporary restraining order against Defendant

4 Matthews International Corporation ("Matthews") selling, attempting to sell, disclosing, or

5 attempting to disclose Tesla's valuable trade secrets relating to dry battery electrode manufacture

6 and/or Tesla's ▓▓▓ tool (and equipment based thereon) to companies other than Tesla, based

7 upon Matthews's unambiguous statement today that it plans to do exactly that.

8       2.    Whether the Court should order Matthews to immediately produce information

9 sufficient to demonstrate the full scope of the design, structure, and operation of any DBE tools it

10 has made available, or plans to make available, to companies other than Tesla.

11 **II.    STATEMENT OF RELEVANT FACTS**

12     **A.    Matthews: Manufacturer of Custom Equipment Designed With and For Tesla**

13       Matthews is a Tesla supplier of custom equipment.  Specifically, Tesla hired Matthews to

14 build certain custom equipment necessary for Tesla's DBE development. Eggleston Decl. ¶ 43.

15 The equipment Matthews supplied was built to Tesla's exacting requirements and reflected years

16 of Tesla's refinement and expertise.  *Id.*  This included, but was not limited to, Matthews

17 providing engineering services to Tesla relating to the design of Tesla's ▓▓▓ tool, ▓▓▓

18 ▓▓▓▓▓▓.  *Id.*  Matthews also handled much of

19 the manufacturing for Tesla's ▓▓▓ tool and was otherwise involved in providing engineering

20 services to Tesla for the furtherance of Tesla's DBE project.  *Id.*

21     **B.    Matthews's Betrayal**

22       Matthews betrayed Tesla.  As Tesla's Complaint (Dkt. 1) explains, Matthews ***actually sold***

23 ***Tesla's prized*** ▓▓▓ ***tool to other companies*** with neither Tesla's knowledge nor its

24 permission.  Eggleston Dec. ¶ 47.  Later, Matthews represented that those sales were subsequently

25 put on hold after Tesla objected.

26       Matthews ▓▓▓▓▓▓▓▓ sought a declaration

27 that a wide variety of DBE technologies Matthews had worked on for Tesla did not actually

28 belong to Tesla, ▓▓▓▓▓▓▓▓

1    ████████████    Ex. C1 at 4.  Tesla disagreed, contending (again, *inter alia*) that ██████████████

2    ██████ Matthews had surrendered any right to sell any "████████████████████████████

3    ██████████████████████████████████████████ *Id.* at 16.

4    The parties received ████████████ yesterday.  Ex. C1.[1] ████████████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████



14   *Id.* at 38 (emphasis added).

15   In late 2024 Matthews provided employees from two DBE companies, ████████████

16   ████████, with direct access to DBE equipment that was an essential clone of Tesla's ████████

17   design.  *See* Eggleston Dec. ¶¶ 39–43.  Matthews had no authority to provide that access or to

18   teach individuals from outside Tesla any details of Tesla's ████████ design.[2] *Id.* The following

19   images supplied by ████████████████ unambiguously depict a Tesla ████████ tool, and

20   particularly ████████████, which Matthews demonstrated to those companies without

21   authorization from Tesla:

22

23

24

25   [1] References to "Exhibit E-__," "T-__," and "C-__ are to the exhibits accompanying the
     Declarations of Bonne Eggleston, Matt Tyler, and Robert Courtney respectively.

26   [2] Other details of Matthews's recent conduct in Europe, though known to Tesla's in-house legal
     team, were disclosed in ████████████████.  Though Tesla requested Matthews's permission

27   to disclose those details to this Court, Matthews refused.  Tesla's request to ████████ for an
     order permitting disclosure to this Court is pending.  Upon obtaining the necessary permission,

28   Tesla will seek the Court's leave to supplement the record.



Videos from Matthews customer ▆▆—another Tesla competitor—show that Matthews has supplied ▆▆ with a Tesla ▆▆▆▆ tool of its own.  The Tesla ▆▆▆▆ web path, Tesla ▆▆▆▆ ▆▆▆▆ unit, and even Tesla ▆▆▆▆ human-machine interface displays are all visible. Another video from the same source shows the strips formed by Tesla's proprietary ▆▆▆▆ ▆▆▆▆ systems:

*See generally* Eggleston Dec. ¶¶ 35–37.

In the same late 2024 time period, Matthews threatened that unless Tesla gave in to various demands, Matthews would compound its misconduct by specifically selling or disclosing Tesla's DBE trade secrets into mainland China. *See* Tyler Dec. ¶ 2 *et seq.* Last fall, Matthews executive Brandon Babe told Matt Tyler, Tesla's Director of Dry Electrode Development, that Matthews was attempting to supply DBE calendering technology to Chinese companies for use in manufacturing electrodes for lithium-ion batteries. Tyler Decl. ¶ 2 *et seq.*[3] Tesla immediately pointed out the gross impropriety of such conduct, and Tesla sought assurances that: (1) Matthews had not actually begun to offer or disclose DBE technology such as ████████ into China; and (2) Matthews would not undertake such acts until the present litigation concludes. Matthews's response was vague. *Id.*

Tesla then told Matthews that unless Matthews immediately stopped selling into China, Tesla would seek injunctive relief. Ex. T8. Matthews relented. It promised that so long as Tesla agreed not to seek a preliminary injunction, Matthews would "not quote, accept orders, disclose, or attempt to disclose any multi-roll calender DBE equipment to any companies in China." That promise was subsequently expanded and recorded as a global standstill agreement. Matthews agreed, in exchange for Tesla not moving for a preliminary injunction, that Matthews would "not sell, attempt to sell, market, demonstrate, deliver, commission, negotiate specifications for, support, service, or install any multi-roll calender equipment used or expected to be used for dry manufacture of battery electrodes, anywhere in the world, other than for Tesla." Exs. T9, T10. That agreement expired on February 5, 2025.

Today, less than twenty-four hours after the agreement expired, Matthews took to the press. It issued a release that misleadingly describes ████████ as a total win for itself, and announces its intention to "immediately resume marketing, selling and delivering its DBE products to other customers." Ex. C2. But the unambiguous evidence is that the "DBE products"

---

[3] For purposes of preliminary relief, declarations providing hearsay testimony are permissible. *Indep. Techs., LLC v. Otodata Wireless Network, Inc.*, 836 Fed. App'x 531, 533 n.3 (9th Cir. 2020).

1  that Matthews has been marketing are not Matthews's at all. They are Tesla's. Specifically, they
2  are copies of Tesla's prized ███████ tool and embody Tesla's valuable trade secrets.

**C.    The Unique Harms Associated With Matthews's Threatened Disclosures**

4      If Matthews resumes its practice of granting teams outside Tesla unrestricted access to
5  Tesla's ██████ tool, those teams will gain an unfair advantage against Tesla in the marketplace
6  for lithium-ion electrodes and batteries. *See* Tyler Dec. ¶¶ 12 *et seq.* The designs in Tesla's
7  ███████ tool are so refined that another interested company, if it were to have unrestricted access
8  to a Tesla ██████ tool, could readily "piggy-back" on Tesla's hard work and skip literal years of
9  painstaking DBE development. *Id.* In other words, such a team would be positioned to massively
10 accelerate its journey to mass DBE production, skipping over the years of work and billions of
11 dollars in investment by Tesla.

12     Those dangers are particularly heightened where operations in mainland China are
13 concerned. China is a major manufacturing site but has historically been a location where the
14 enforcement of intellectual property and confidentiality rights (particularly those held by
15 American companies like Tesla) are not reliable.[4] In addition, in view of the lacking reciprocity
16 between China and the United States with respect to the recognition of civil judgments, once a
17 trade secret passes to China, a civil judgment from a U.S. Court may not be recognized or
18 enforced in China.[5] If companies, factories, or even certain individuals in China were to learn the
19 details of Tesla's DBE secrets (including those embodied in Tesla's ██████ tool), the effect on

---

21  [4] *See, e.g.*, Ex. C3 (2023 Report to Congress of the US Trade Representative) at 51 ("Serious
22  inadequacies in the protection and enforcement of trade secrets in China have been the subject of
    high-profile engagement between the United States and China in recent years. Several instances
23  of trade secret theft for the benefit of Chinese companies have occurred both within China and
    outside of China. Offenders in many cases continue to operate with impunity.").
24  [5] *See, e.g.*, Ex. C4 (Clarke, Donald C., "*The Enforcement of United States Court Judgments in*
25  *China: A Research Note*" (2004), GW Law Faculty Publications & Other Works) at 1067
    ("Whether the judgments of United States courts can and will be enforced in China is a question
26  that will be increasingly asked as economic ties grow between the two countries. At present, at
    least, the answer is straightforward: U.S. judgments will not be enforced. Chinese law requires the
27  existence of a treaty or *de facto* reciprocity in order to enforce a foreign judgment; neither exists
    between the United States and China. Research reveals specific cases in which enforcement was
28  refused and no cases in which enforcement was granted.").

1    Tesla could be devastating. Tesla has invested, conservatively, in excess of an estimated

2    $1 billion dollars in developing DBE manufacturing technology on the understanding that Tesla

3    will have secure ownership of that technology for years to come. But if Chinese companies,

4    factories, or even individuals gain access to Tesla's confidential technology such as its ▮▮▮▮▮▮

5    tool, then that confidential technology could spread like wildfire throughout Chinese

6    manufacturing plants. The result would deprive Tesla of having the sole use of its own

7    technology, and Chinese manufacturers who had spent nothing to develop the technology could

8    suddenly use it to compete against Tesla in the market for lithium-ion batteries and/or electrodes.

9        In that context, the competitive advantage that Tesla obtained by investing so much in

10   DBE manufacture would have been wasted, leaving Tesla far worse off than it otherwise would

11   have been. The result would certainly be a price war, based principally on other companies

12   (particularly ones with China-based manufacturing) unfairly using Tesla's own DBE technology

13   against it. In that event, Tesla would be burdened by the expenses of investing in DBE research

14   and development, but the companies improperly misappropriating Tesla's technology would not,

15   creating a playing field that is unevenly and unfairly tilted against Tesla. In that context, Tesla

16   would stand to lose pricing freedom, relationships with both suppliers and customers, and

17   customer goodwill, all without any hope of meaningful recovery. In sum, such an event would

18   essentially punish Tesla for making large-scale investments in DBE technology, and it would

19   improperly reward Matthews for unlawfully absconding with that technology and delivering it to

20   factories and other interests in Europe and in mainland China.

21       To avoid such imminent and irreparable harm, Tesla has no choice but to seek judicial

22   protection against Matthews imminently selling, attempting to sell, or disclosing Tesla's trade

23   secrets relating to DBE manufacturing.

24   **D.    Tesla and Its Proprietary Dry Battery Electrode ("DBE") Process**

25       As its Complaint describes, Tesla is the world's innovation and manufacturing leader for

26   sustainable energy production, storage, and automotive technologies. Dkt. 1 ¶ 11. This case

27   relates to a crucial aspect of Tesla's business: its industry-leading "dry-electrode" (sometimes

28   called "DBE," or "dry battery electrode") process for manufacturing the electrodes used in

1    lithium-ion cells.  *Id.* ¶ 12.  "Dry" refers to the fact that Tesla's process does not use solvents or

2    slurries (*i.e.*, "wet" steps) during electrode manufacture.

3              Creating a workable "dry" process for the manufacture of electrodes for lithium-ion

4    batteries—and particularly a dry process that could be scaled up ████████████████████████—

5    was extraordinarily difficult.  There were many reasons for that difficulty, but two critical

6    challenges were ████████████████████████████████████████

7    ████████████████ as well as ████████████████████████████████.  These

8    two basic characteristics created innumerable challenges that Tesla faced in creating a workable

9    DBE manufacturing process.  ████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████ many of which had to be invented by Tesla from

13   whole cloth.  It took years of dedicated effort for Tesla to develop workable approaches to these

14   and many other problems, even before it took up the many challenges that accompany bringing a

15   technology from proof-of-concept stage up to mass production.  This included innovations at

16   every scale of production, ████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████ Advancing from each level of work to the next ████████████████

20   ████████████ involves an exponential increase in the complexity of the technology involved.

21   **E.     Tesla's Trade Secrets in DBE and in Tesla's ████████ Tool**

22              Over the course of more than five years working on DBE, Tesla has made innumerable

23   innovations and advances surrounding electrode manufacturing.  Tesla is proud of its ability to

24   advance that work when no other company was able to do so.  Eggleston Decl. ¶ 6 *et seq*.  Many

25   of those valuable innovations are embodied in Tesla's ████████ tool for DBE manufacturing:

26

27

28

                                                    8

Ex. E1.

For purposes of this motion, and in view of the immediate nature of the relief sought by Tesla, Tesla focuses on four specific trade secrets as justifying the need for a temporary restraining order. Matthews learned these trade secrets through its confidential work with Tesla, and Matthews apparently now plans to disclose those trade secrets to Tesla's direct competitors.[6]

### 1.    Tesla's Unique and Valuable ▮▮▮▮ Tool

The Tesla ▮▮▮▮ tool is the world's premier small-to-medium scale equipment for making electrodes via a dry process. *See* Eggleston Dec. ¶¶ 17–21. Tesla spent years developing it, with tens of thousands of engineer-hours and over a billion dollars directed to the process. *Id.* ¶ 30. The Tesla ▮▮▮▮ embodies a specific configuration that is solely unique to Tesla, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 34. The Tesla ▮▮▮▮ tool is extraordinarily complex, with dozens of interlinked technologies including, and certainly not limited to:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[6] Tesla anticipates presenting a larger number of trade secrets for adjudication in the merits phase of this proceeding or in the arbitration if the merits phase proceeds in arbitration.

See *id.* ¶ 19.

As discussed herein, Matthews has demonstrated Tesla's ▬▬▬ tool—or tools so similar to and plainly based on Tesla's ▬▬▬ tool—to the rest of the industry, inflicting irreparable harm on Tesla.

    2.    **Tesla's specific and valuable trade secrets relating to the size, shape, positioning, and configuration of the** ▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬

One of the many technologies in Tesla's ▬▬▬ tool is Tesla's proprietary design for the systems that clear the rolls of extraneous electrode material so that the films being created have precisely the right shape and ▬▬▬▬
thickness. ▬▬▬▬▬





*Id.*

   **3.**  **Tesla's trade secrets relating to the** ████████████

   Another critically important technology in Tesla's ████ tool is its equipment for ████████████████████████. *See* Eggleston Decl. ¶ 25. Tesla's ████ tool has specialized technology, designed by Tesla's engineers, for trimming an electrode film into carefully chosen dimensions prior to lamination while not letting the electrode peel off the rolls. Within Tesla, these are called ████████ technologies. *Id.* They include the use of carefully designed ████████ ████████████████████████████████████████ In Tesla's tools, ████████ devices are tightly integrated into the machine design, positioned ████████ at carefully chosen locations that permit them to stay out of the way of the other operations being performed, while effectively ████████████. They are equipped with extremely precise ████████. All of this is central to maintaining good performance of Tesla's ████ tool and enables the process to achieve very tight tolerances required for lithium-ion batteries. *Id.* Previous tools, though some of them had ████████, did not have the ████████████████ ████████ that is critical to the Tesla ████ design.

1         **4.**    **Tesla's trade secrets for handling the** ███████ **forces encountered**

2         **in DBE manufacturing**

3     The rollers in Tesla's █████ tool apply great pressure and run at high speed. Eggleston

4 Decl. ¶ 25. While developing its DBE manufacturing tools, Tesla determined that ██████████

5 ████████████████ *Id.* In DBE manufacturing tools,

6 ████████████████████

7 ████████████████████

8 ██████████. *Id.* Without ██████████,

9 unacceptable vibrations and even damaging oscillations can

10 occur. *Id.* Such problems, unless controlled, make efficient

11 production of electrodes impossible. *Id.* █████ is thus

12 equipped with a Tesla-owned design (see image) for ██████████

13 ████████████████████████. *Id.*

14 ¶¶ 25–26; Ex. E5. This design is both unique to Tesla and changes the operation of the tools

15 embodying it because ████████████████████

16 ██████ ensuring smooth transitions of the dry electrode film which is processed on both sides of

17 the roll. *Id.*

18     Tesla's █████ design is owned by Tesla and is not known by others in the industry

19 except by Tesla's express authorization and under strict confidentiality requirements. Eggleston

20 *Id.* ¶ 27. Tesla's proprietary █████ design has great value to Tesla, and would have great

21 value to others in the industry were they to gain access to it. *Id.* Tesla's █████ design

22 solved a major operational problem in Tesla's █████ tool, without which efficient DBE

23 production would not be possible. *Id.* Such technology was necessary to make electrode material

24 at precise tolerances and at economic manufacturing rates. *Id.*

25         **5.**    **Tesla's** █████ **Technology Is Highly Confidential**

26     Tesla invested over one billion dollars to develop its █████ tool and Tesla's other DBE

27 technologies. Eggleston Decl. ¶ 29. In Tesla's view, such technologies represent the future of

28 electrode manufacturing, and Tesla's investments were intended to give Tesla a lasting

1  technological advantage against competing battery manufacturers, particularly those in Europe and

2  in mainland China.  *Id.*  At all times Tesla has recognized that the value of its DBE technology is

3  highly dependent on secrecy.  As such, Tesla has taken every precaution to keep its DBE project,

4  and particularly the design of Tesla's ████ tool and other DBE tools, confidential.  While all

5  Tesla employees have signed generic confidentiality undertakings, Tesla employees working on

6  DBE/████ technology are also required to sign supplemental confidentiality undertakings

7  specifically limiting them from discussing the DBE project—even with other Tesla employees.

8  *Id.*  Tesla's DBE team also requires the vendors and suppliers that they work with to maintain the

9  confidentiality of Tesla's technology—and, indeed, Matthews (the defendant in this case) signed

10  several such undertakings.  *Id.*  Further, Tesla's DBE team works only on secure computer

11  systems, minimizes the use of printed material or handwritten notes, and maintains their work in

12  secure environments at Tesla facilities.  *Id.*

13          **F.**      ████████████████

14          Tesla and Matthews hotly dispute whether arbitration is required for any of Tesla's claims

15  before the Court (*i.e.*, Tesla's trade secret and related claims).  Last October, the Court ordered ██

16  ████████████████████████  *See* Dkt. 50 (Sealed Order of Oct. 7, 2024) at 2.

17  Accordingly, Tesla initiated a ████████████████████  Yet, pursuant to the

18  Court's order, ████████████████████.  Moreover, although the parties

19  have agreed on ████████████████████ so this

20  motion cannot be brought in ████████ in a timely manner.  And, regardless of ████████

21  ████████ under Ninth Circuit authority, this Court retains jurisdiction to address the need for

22  immediate injunctive relief.  *Toyo Tire Holdings of Americas, Inc. v. Continental Tire North Am.,*

23  *Inc.*, 609 F.3d 975 (9th Cir. 2010); *Capriole v. Uber Techs., Inc.*, 7 F.4th 854 (9th Cir. 2021).

24  **III.    ARGUMENT**

25          **A.     Legal Standards**

26          "The standard for issuing a TRO is the same as that for the issuance of [a] preliminary

27  injunction."  *Koller v. Brown*, 224 F. Supp. 3d 871, 875 (N.D. Cal. 2016); *see also Babaria v.*

28  *Blinken*, 87 F.4th 963, 976 (9th Cir. 2023).  Such measures may be entered as necessary to

1  "preserve the *status quo ante litem* pending a determination of the action on the merits." *Tanner*

2  *Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963); Fed. R. Civ. P. 65(a).  A TRO

3  is warranted upon a "'strong showing' that [the movant] is 'likely to succeed on the merits,' that it

4  will be 'irreparably injured absent [the injunction],' that the balance of the equities favors it, and

5  that [an injunction] is consistent with the public interest."  *Whole Women's Health v. Jackson*, 141

6  S. Ct. 2494, 2495 (2021) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see also Winter v.*

7  *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Disney Enters., Inc. v. VidAngel, Inc.*, 869

8  F.3d 848, 856 (9th Cir. 2017).  In the Ninth Circuit, "a preliminary injunction may also be

9  appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships

10 . . . tips sharply towards' it, as long as the second and third *Winter* factors are satisfied."  *Disney*

11 *Enters.*, 869 F.3d at 856 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35

12 (9th Cir. 2011) [*AWR*].

13      That courts may enjoin unauthorized disclosure or use of trade secrets is "settled beyond

14 peradventure."  *Empire Steam Laundry Co. v. Lozier*, 130 P. 1180, 1182 (Cal. 1913) (citing

15 authority); *accord* 4 Milgrim on Trade Secrets § 15.02[1][a] (2024); *see also* 18 U.S.C.

16 § 1836(b)(3)(A); Cal. Civ. Code § 3426.2.  At the preliminary injunction stage of a trade secret

17 case, the "likely to succeed on the merits" analysis seeks demonstration that the movant is likely to

18 prove each element of its trade secret misappropriation claim: actual secrecy; independent

19 economic value of the asserted secret; the application of reasonable measures to protect the

20 confidentiality of the asserted secret; and misappropriation by the defendant.  *See generally*

21 18 U.S.C. §§ 1836, 1839 (federal law); Cal. Civ. Code § 3426.1 (California state law).

22      District courts' authority to preserve the *status quo* via preliminary relief is undiminished

23 by the presence of arbitrable claims (████████████████████████).  "A district

24 court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to

25 preserve the *status quo* and the meaningfulness of the arbitration process—provided, of course,

26 that the requirements for granting injunctive relief are otherwise satisfied."  *Toyo Tire Holdings of*

27 *Ams.*, 609 F.3d 975, 981 (9th Cir. 2010); *see also Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120,

28 1129 (9th Cir. 2024) ("[T]he mere existence of an arbitration provision does not necessarily

1  preclude a district court from awarding preliminary injunctive relief to preserve the status quo in

2  advance of, and in support of, the arbitration.").  Because in this case the requested relief is

3  necessary to preserve the "meaningfulness of the arbitration process," the Court's authority to

4  protect Tesla via TRO is clear.

**B.    Tesla Is Likely to Succeed on The Merits of Its Claim that Matthews's Attempts to Sell or Disclose Tesla's DBE Technology in Europe and Into China Are Improper**

8  The record overwhelmingly demonstrates that Matthews's ongoing threats to disclose

9  Tesla's ▓▓▓ technology in Europe and into China comprises imminent trade secret

10  misappropriation under both U.S. and California law.

**1.    Tesla's Asserted ▓▓▓ Technology is Secret**

12  In this Motion, Tesla's "Asserted ▓▓▓ Technology" is:

- Tesla's specific and valuable ▓▓▓ tool;
- Tesla's specific and valuable trade secrets relating to the ▓▓▓ ▓▓▓ that clear electrode material from the rolls;
- Tesla's specific and valuable trade secrets relating to ▓▓▓ and
- Tesla's specific and valuable trade secrets for handling the ▓▓▓ forces encountered in DBE manufacturing.[7]

18  All these technologies are secret.  Tesla has never published material details of any of these

19  technologies, either directly or indirectly.  Tesla is unaware of any person, anywhere, who has

20  lawfully learned the details of these Tesla technologies and their application to DBE except under

21  Tesla's strict regime of confidentiality undertakings.  While it is possible that some individuals

22  may have reviewed some aspects of the Asserted ▓▓▓ Technology without Tesla's secrecy

23  restrictions because of Matthews's past misconduct (*e.g.*, in connection with Matthews's

24  unauthorized ▓▓▓ sales in the past, or its improper patent filings), to Tesla's understanding

25  such review has not resulted in any of the Asserted ▓▓▓ Technology becoming publicly

---

[7] These four exemplary secrets are illustrative solely for this Motion and do not forfeit Tesla's reliance on the numerous other trade secrets embodied in Tesla's ▓▓▓ tool and in the rest of Tesla's DBE work as other parts of this litigation may require.

available. Regardless, courts have long rejected the argument that a defendant can evade the consequences of misappropriating trade secrets simply by publishing them. *E.g.*, *Art of Living Found. v. Does 1–10*, No. 10-cv-05022-LHK, 2011 WL 2441898, at *12 (N.D. Cal. June 15, 2011) ("Defendants cannot rely on their own improper [publication] to support the argument that the works are no longer secrets."); *see also Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983) ("[A] wrongdoer who has made an unlawful disclosure of another's trade secrets cannot assert that publication to escape the protection of trade secret law."); *Underwater Storage, Inc. v. U.S. Rubber Co.*, 371 F.2d 950, 955 (D.C. Cir. 1966) ("We do not believe that a misappropriator or his privies can 'baptize' their wrongful actions by publication of the secret.").

### 2. Tesla's Asserted ███████ Technology Is Independently Valuable

Dr. Eggleston's declaration describes in detail the enormous commercial value of Tesla's Asserted ███████ Technology. Put briefly, the Tesla ███████ tool design converts what was previously a slow, expensive, and energy intensive process for electrode manufacturing into one that is more efficient, faster, and easier to automate. Eggleston Decl. ¶ 6 *et seq*. It removes the "wet" processing steps that were both slow and inefficient, and it replaces them with a radical new design in which the tool itself handles the ***entire*** electrode production process starting only with precursors of powder and foil. That technology promises to be transformational in the battery manufacturing field, and Tesla spent billions of dollars to obtain it. *Id.* ¶¶ 17–21, 29.

███████ individual technologies are similarly valuable. *Id.* ¶ 22. Tesla's ███████ ███████████████ solved serious problems with clearing electrode from the rolls and maintaining high-grade performance even in high pressure and temperature environments. ███ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Such technologies were not only unique to Tesla but are critical to ensuring ongoing performance by ███████. *Id.* ████████████████████████████████████████████ ███████ As discussed above, they enable extremely precise shaping of the electrode material on the foil without sacrificing either speed or efficiency. *Id.* ¶ 24.

1   Tesla ███████████ technology is similarly valuable. *Id.* ¶ 25. Oscillation and

2   vibration were major problems to be solved in DBE production, particularly as one contemplates

3   scaling up from pilot to mass production tooling. Ultimately, Tesla's confidential work led to a

4   new design that effectively solved those critical problems with respect to the ███████████

5   used to drive the rollers. *Id.*

### 3.    Tesla Has Applied Reasonable Confidentiality Measures

7      It is beyond serious question that Tesla's efforts to maintain confidentiality for its DBE

8   technology, including the Asserted ████ Technology, have been far above the "reasonable"

9   standard of care. *See id.* ¶ 28 *et seq.* All Tesla employees have signed confidentiality

10  undertakings. Tesla employees working on DBE/████ are also required to sign supplemental

11  confidentiality undertakings specifically limiting them from discussing the DBE project even with

12  other Tesla employees. Tesla's DBE team also requires its vendors and suppliers to commit to

13  maintaining the confidentiality of Tesla's technology—and, indeed, Matthews (the defendant in

14  this case) signed several such undertakings. *See* Dkt. ███████████). Further,

15  Tesla's DBE team works only on secure computer systems, minimizes the use of printed material

16  or handwritten notes, and maintains their work in secure environments at Tesla facilities. These

17  measures should (and but for Matthews's betrayal, would) have been sufficient to protect the

18  secrecy of the DBE project, including all the Asserted ████ Technology.

### 4.    Further Improper Disclosures by Matthews Are Imminent

20     Matthews has already sold Tesla's ████ technology without authorization—it does not

21  deny that. But rather than reckoning the consequences of such conduct, Matthews has simply

22  continued. Its demonstrations and marketing opportunities for prospective buyers (such as

23  ███████████) to run trials on Tesla's ████ are alone proof that Matthews is trying to

24  build a business based on Tesla-owned, Tesla-confidential technology. Still further, Matthews has

25  formally and publicly stated its intent to make sales and disclosures that would have been

26  prohibited if the standstill were still in force, essentially committing Matthews to reject any

27  amicable extension of the standstill agreement. In view of those considerations, the imminence of

28  further disclosures is beyond doubt.

1
2

C.    **Tesla Faces Irreparable Harm If Matthews Pursues Its Threatened Disclosures**

3    It is impossible for engineers and scientists to "unlearn" confidential Tesla-owned

4  technology if Matthews shows it to them.  Matthews's demonstrations of Tesla-confidential

5  technology ███████████████ are the tip of the iceberg.  Eggleston Dec. ¶ 31 *et seq*.  If

6  Matthews continues such demonstrations and live trials, then there is every reason to believe that

7  Tesla's confidential technology will be disseminated throughout the world, leaving Tesla with no

8  practical ability to maintain control over the technology it spent over a billion dollars to develop.

9    And as to China particularly, the ability of U.S.-based rightsholders to have intellectual

10  property respected in China is uncertain at best.  Tyler Dec. ¶ 2 *et seq*.  China is a dynamic

11  marketplace in which the operators of businesses and factories often place first-mover status above

12  intellectual property considerations.  China is also one of the world's major centers for

13  manufacturing of lithium-ion batteries, and indeed many of the companies that Tesla competes

14  with in the field of battery manufacturing use China-based factories.  As Dr. Eggleston's

15  Declaration explains, if Chinese companies, factories, or even certain individuals were to gain

16  access to Tesla's confidential technology such as the Asserted ██████ Technology, it would

17  cause the confidential technology to spread like wildfire throughout Chinese manufacturers.

18  Eggleston Dec. ¶ 30.  The result would be that Tesla would no longer have sole use of its own

19  technology, and Chinese manufacturers (along with companies that utilize Chinese manufacturing)

20  who spent nothing to develop the technology could suddenly use it to compete against Tesla in the

21  market for lithium-ion batteries and/or electrodes.  In that context, the competitive advantage that

22  Tesla obtained by investing so much in developing DBE manufacturing technologies would be

23  wasted, leaving Tesla far worse off than it otherwise would have been.  Tesla would stand to lose

24  pricing freedom, relationships with both suppliers and customers, and customer goodwill, all

25  without any hope of meaningful recovery.  In sum, such an event would essentially punish Tesla

26  for making large-scale investments in DBE technology and would improperly reward Matthews

27  for unlawfully absconding with that technology and delivering it to factories and other interests in

28  mainland China.

1

**D.    The Balance of Equities Favors Protecting Tesla by Requiring Matthews's**

2

**Compliance With Its Obligation to Maintain Confidentiality of Tesla's DBE**

3

**Trade Secrets**

4        The equities tip sharply in Tesla's favor.  As demonstrated above, Tesla will face severe

5   and irreparable harm if the Court does not enjoin Matthews from following through on its threat to

6   disclose Tesla's high-value, highly confidential trade secrets worldwide, including in Europe and

7   in China.  The inequity of that situation would be particularly stark considering that Tesla

8   ▆▆▆▆▆▆▆▆▆▆ with Matthews, ▆▆▆▆▆▆▆, to avoid precisely this outcome.  Matthews

9   has blatantly and baselessly disregarded its obligations ▆▆▆▆▆▆▆▆▆▆▆▆ with

10  Tesla; there is no reason whatsoever why this Court (or any tribunal) should protect Matthews's

11  ability to continue harming Tesla by failing to uphold its obligations.

12       The Court should be deeply skeptical about any assertion by Matthews that an injunction

13  would unfairly impair Matthews's ability to freely develop its DBE business.  As Dr. Eggleston's

14  Declaration explains, whatever experience Matthews has relating to DBE—and particularly any

15  experience it has in multi-roll calenders for DBE, or in pilot tools employing the details of Tesla's

16  confidential "All-In-One" design—is solely attributable to Matthews's past work with Tesla.

17  Basic fairness considerations urge against permitting Matthews to evade its confidentiality

18  obligations and irreparably harm Tesla by disclosing that confidential technology.

19       **E.    Protecting Tesla from Matthews's Attempts to Share Tesla's Valuable DBE**

20              **Technology With Chinese Factories is Consistent With the Public Interest**

21       Courts in the Ninth Circuit and throughout the country have repeatedly endorsed the use of

22  preliminary relief to enforce a defendant's confidentiality obligations.  *E.g.*, *Compass Bank v.*

23  *Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) ("[E]nforcing [confidentiality] covenants is

24  consistent with the public policy in protecting a company's interest in its customer base from

25  unfair competition and the protection of trade secrets and confidential information."); *Richmond*

26  *Techs., Inc. v. Aumtech Bus. Sols.*, No. 11-cv-02460-LHK, 2011 WL 2607158, at *22 (N.D. Cal.

27  Jul. 1, 2011) ("[T]he State [of California] also has a strong history of protecting trade secrets from

28

misue."). The basic notion that the public interest favors enjoining ongoing breaches of confidentiality and nondisclosure agreements is reflected repeatedly in decisions nationwide:

- "An injunction will serve the public interest because it will promote fair business dealings and enforcement of confidentiality and nondisclosure agreements that enable parties to assess potential transactions that require the sharing of sensitive commercial information." *Onsite 340B, LLC v. 340Basics, Inc.*, No. 18-CV-596-JS, 2018 WL 2323790, at *1 (E.D. Pa. Feb. 14, 2018);

- "Regarding the nondisclosure obligations, this factor weighs strongly in favor of [movant]. There is a public interest in guaranteeing companies protection for their confidential or proprietary information . . . ." *HCC Specialty Underwriters, Inc. v. Woodbury*, 289 F. Supp. 3d 303, 326 (D. N.H. 2018);

- "[T]he Court finds that there is a public interest in upholding enforceable contracts, such as the Non-Disclosure Agreement in this case." *Iofina, Inc. v. Khalev*, No. CIV-14-1328-M, 2017 WL 663558, at *3 (W.D. Okla. Feb. 17, 2017);

- "I therefore find that enforcing the Non–Solicitation and Non–Disclosure Agreement against Harnett is consonant with the public interest." *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 245 (D. Mass.), *aff'd*, 731 F.3d 6 (1st Cir. 2013) (internal quotation omitted); and

- "The public interest also counsels in favor of enforcing the parties' Confidentiality and Non–Disclosure Agreement and precluding use of alleged proprietary information pending a determination on the merits." *Council on Am.-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 80 (D.D.C. 2009).

At the same time, no public interest is served by allowing Matthews to continue flouting its confidentiality obligations. *See HCC Specialty Underwriters*, 289 F. Supp. 3d at 326 ("There is . . . little in the way of a contrary public interest that would disfavor an injunction enforcing the nondisclosure restrictions in the 1996 Agreement." (internal quotation omitted)).

**F.     Because an Injunction Is Both Substantively Warranted and Necessary to Preserve the Meaningfulness of the Arbitration Process, the Court Has Authority to Grant Tesla's Requested Relief**

The claims in Tesla's Complaint are momentarily suspended ▮▮▮▮▮▮▮▮▮▮. Tesla believes its claims are triable before this Court, but it must await ▮▮▮▮▮▮▮▮▮ resolution of Matthews's belief that ▮▮▮▮▮▮▮▮▮▮. Yet this is not a situation in which Tesla has no forum in which to seek protection. In the Ninth Circuit, a district court is expressly authorized to enter interim injunctions in such circumstances, as confirmed beyond peradventure by *Toyo*

1  *Tire Holdings of Americas, Inc. v. Continental Tire North America, Inc.*, 609 F.3d 975 (9th Cir.

2  2010) and *Capriole v. Uber Technologies, Inc.*, 7 F.4th 854 (9th Cir. 2021).

3       Those cases explain district courts' residual authority to protect litigants from the

4  irreparable harms that may occur while waiting for arbitration to spin up. In *Toyo*, a plaintiff

5  risked losing all its customers before an appropriate arbitration panel could be constituted; the

6  Ninth Circuit reversed a district court's refusal to consider interim relief:

7      . . . Toyo seeks an injunction to preserve the *status quo* until the
    arbitral panel can consider and rule upon Toyo's application for

8      interim relief pending the arbitration panel's final decision. Allowing
    a district court to grant this type of relief is not contrary to the

9      "emphatic federal policy in favor of arbitral dispute resolution . . . ."
    *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999). To

10      the contrary, in cases such as this, judicial interim relief may be
    necessary to preserve the meaningfulness of the arbitral process.

11

12  *Toyo*, 609 F.3d at 980; *see also Capriole*, 7 F.4th at 868 (discussing same). And in *Capriole*, the

13  appeals court put particular emphasis on the importance of preserving the *status quo*. 7 F.4th at

14  868 (affirming district court's determination that preliminary re-classification of employment

15  relationships would upend the *status quo*). Those cases provide the appropriate path here.

16       Though Matthews's sharing of Tesla-owned technology in Europe is egregious, it is not

17  yet large-scale. It is also Tesla's understanding that Matthews's sharing of Tesla-owned

18  technology into China has so far been limited. In view of the ▉▉▉▉▉▉▉▉▉▉▉▉▉

19  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

20  ▉▉▉▉▉▉▉▉ keeping the level of China-directed disclosure as low as possible has the highest

21  importance to Tesla and, as discussed *supra*, poses inordinate risks to Tesla. Whatever tribunal

22  ends up handling the merits of Tesla's trade secret claims against Matthews (an arbitrator or this

23  Court), it would be grossly unfair and deeply prejudicial if Tesla were not given some opportunity

24  to have the *status quo* held in place while those proceedings play out.

25  **IV.    THE NEED FOR CONFIDENTIAL DISCOVERY FROM MATTHEWS**

26       Finally, to the extent Matthews may claim Tesla's motion suffers a paucity of Matthews-

27  confidential information about the design, development, capabilities, and the circumstances of

28  demonstration of DBE tools that Matthews has marketed or shown to companies other than Tesla,

TESLA EMERGENCY MOTION FOR TRO
Case No. 5:24-cv-03615-EJD-VKD

1  that is no defense at all.  Tesla has repeatedly requested technical details of the tools that Matthews

2  sold, demonstrated, offered, etc. to third parties, and Matthews has refused every such request.

3  *See, e.g.*, Exhibits C5–7.  For that reason, Tesla respectfully asks that, to the extent Matthews may

4  deny any of the descriptions herein about the tools Matthews has sold to companies other than

5  Tesla, the Court should require Matthews to produce documents sufficient to show, in detail, the

6  full design and specifications of those tools as well as a knowledgeable witnesses for deposition

7  before Tesla files its reply.

8  **V.     CONCLUSION**

9       For the reasons above, Tesla respectfully asks that the Court enter a Temporary Restraining

10  Order against Matthews as follows:

11       1.     Matthews should be ordered to cease and refrain from selling, attempting to sell,

12  disclosing, or attempting to disclose any article, document, equipment, or other matter comprising

13  Tesla's valuable trade secrets relating to dry battery electrode ("DBE") manufacture and/or Tesla's

14  ▋▋▋ DBE tool.  This specifically includes Matthews' demonstration to third parties of

15  equipment based on ▋▋▋.

16       2.     Matthews should be ordered to immediately produce information sufficient to

17  completely demonstrate the design and operation of the DBE equipment Matthews has

18  demonstrated or plans to demonstrate to companies other than Tesla.

19

20  Dated: February 7, 2025                    FISH & RICHARDSON P.C.

21

22                                            By:  *Robert Courtney*
                                                   Robert Courtney

23
                                            Attorney for Plaintiff,
24                                          TESLA, INC.

25

26

27

28

22